**F. Lee BAILEY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 96–666C.

United States Court of Federal Claims.

Feb. 10, 1998.

**450**

Kenneth J. Fishman, Bailey, Fishman & Leonard, Boston, MA, attorney of record for plaintiff. John L. Napier, Winston & Strawn, Washington, DC, of counsel.

Sharon Y. Eubanks, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were David M. Cohen, Director, Civil Division, and Frank W. Hunger, Assistant Attorney General, attorneys of record for defendant.

## OPINION

HORN, Judge.

The above-captioned case is before the court on the defendant's motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) for lack of subject matter jurisdiction or, in the alternative, pursuant to RCFC 12(b)(4) for failure to state a claim upon which relief may be granted. The plaintiff filed a complaint [1] against the United States in this court which alleges that the plaintiff entered into an oral contract with the defendant for transfer to the plaintiff of 602,000 shares of Biochem Pharma stock that was previously owned by Claude Luis Duboc, a client who the plaintiff was defending in a criminal matter. This stock allegedly had been purchased with proceeds from Mr. Duboc's drug trafficking activities. The plaintiff alleges that the government agreed not to seek forfeiture of this stock, which, according to the plaintiff, was transferred to the plaintiff's "account unconditionally and in fee simple." In his opposition to the defendant's motion to dismiss, the plaintiff further alleges that "[a]t the time the agreement was entered into between Bailey and the Government, there were no discussions of any kind concerning Bailey's serving in any kind of trustee capacity with respect to the stock." According to the plaintiff, he "agreed to accept the said stock as the source of various fees and expenses in connection with the Duboc case, in lieu of the cash previously offered or other form of payment." The plaintiff claims that the defendant breached this oral contract by later seeking forfeiture of the stock.

The defendant, in its motion to dismiss, states that the plaintiff's complaint should be dismissed because it fails to identify a basis for this court's jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491 (1994), *as amended by* Act of October 19, 1996, 28 U.S.C.A. § 1491 (1997). Specifically, the defendant alleges that the Department of Justice officials with whom the plaintiff claims he reached an agreement lacked the requisite authority necessary to bind the United States. The defendant also argues that Mr. Bailey cannot prevail in the above-captioned case because he is attempting to relitigate

---

1. The plaintiff filed an initial complaint on October 22, 1996, which included claims for breach of express contract, breach of implied contract and for quantum meruit. The plaintiff filed an amended complaint on January 21, 1997 that included only the claims for breach of express contract and for breach of contract implied-in-fact. All further references in this opinion are to the amended complaint.

claims that were resolved previously by the United States District Court in *United States v. Claude Luis Duboc,* Case No. GCR 94–01009–MMP, United States District Court for the Northern District of Florida, Gainesville Division. In the plaintiff's opposition to the defendant's motion to dismiss, he states that, assuming the truth of the facts alleged in the complaint, he has established a breach of contract claim upon which relief can be granted and, thus, the complaint should not be dismissed. The plaintiff further argues that he is seeking a remedy under the Tucker Act in this court which was not available in the District Court and, therefore, that the doctrine of claim preclusion does not apply.

## FACTS

The plaintiff, F. Lee Bailey, is an attorney who is licensed to practice in both Florida and Massachusetts. In March 1994, he was retained to represent Claude Luis Duboc who had been charged with international drug importation and money laundering in the matter of *United States v. Claude Luis Duboc,* Case No. GCR 94–01009–MMP, United States District Court for the Northern District of Florida, Gainesville Division. The plaintiff informed members of the United States Attorney's Office for the Northern District of Florida that Mr. Duboc was willing to negotiate a plea of guilty.

According to the complaint, the government's focus then became the forfeiture and repatriation of Mr. Duboc's property, which was estimated to be worth between $50,000,000.00 and $100,000,000.00. Much of Mr. Duboc's property, however, was located outside of the United States and included securities and cash in Luxembourg, real estate in Hong Kong, numerous vehicles, a yacht, and two houses in France. The houses in France required substantial repairs and maintenance in order to realize their maximum value at sale. In addition to the repairs, there also were a number of other necessary expenses associated with Mr. Duboc's property, including taxes, the cost of staff, overdue debts to tradespersons, and maintenance costs.

The plaintiff alleges that he had discussions with the United States Attorney's Office about the costs associated with the maintenance, liquidation and repatriation of the overseas property, and the attorney's fees and legal expenses associated with the representation of Mr. Duboc. According to the plaintiff, "[t]he government prosecutors became concerned that they would need assistance with the repatriation of Duboc's assets and asked Bailey to take on the responsibility of repatriating Duboc's overseas assets. Bailey agreed to the assignment."

According to the complaint, on or about April 26, 1994, the plaintiff had a private meeting with Assistant United States Attorney (AUSA) Gregory R. Miller who offered to unconditionally transfer to the plaintiff one of Mr. Duboc's Luxembourg cash accounts, which contained approximately $3,500,000.00, from which the plaintiff's claims for "compensation for his services would be paid." Mr. Bailey alleges that AUSA Miller "on behalf of the United States" agreed to exempt this account from any forfeiture claim by the government.

Mr. Duboc also owned 602,000 shares of Biochem Pharma stock, a Canadian pharmaceutical company that is publicly traded on the NASDAQ stock exchange. The plaintiff states that during the course of a meeting, on April 26, 1994, United States Drug Enforcement Special Agent Carl Lilly recommended that, instead of transferring the Luxembourg cash account to the plaintiff, it would be more advantageous to all of the parties to transfer the shares of Biochem Pharma stock to the plaintiff. According to the plaintiff, Special Agent Lilly suggested this plan because, under the applicable statutes, the government could not hold the stock and would have to sell it immediately upon forfeiture in one block, probably destroying the value of the stock and diminishing the potential yield to the United States.

The plaintiff also alleges in his complaint that at a private conference between Mr. Bailey and AUSA Miller, who, according to the plaintiff, was "acting on behalf of the United States," the plaintiff was told that "Bailey would have the right to sell any and all of the shares of Biochem Pharma at any time, and in any fashion, Bailey chose," but that "if the Biochem Pharma stock were to decrease in value, there would be no other

source from which Bailey could be compensated for all of his services and reimbursed for his expenses." The plaintiff states that he agreed to accept the stock instead of the money in the Luxembourg account as the source of his fees and expenses. The plaintiff alleges that the parties understood that the plaintiff bore the risk of loss if the stock price decreased, but that he would have the benefit of any increase if the stock price rose.

The 602,000 shares of Biochem Pharma stock were transferred from Mr. Duboc to a personal account maintained by the plaintiff at Credit Suisse in Geneva, Switzerland on or about May 9, 1994. At the time of the stock transfer, the value of the stock was $5,891,352.00. The plaintiff alleges that the expenses associated with the *Duboc* case, including legal defense costs, overseas property maintenance and repatriation costs, and legal fees, were to be paid from this corpus of $5,891,352.00. The plaintiff believed that the difference, if any, between the $5,891,-352.00 that was transferred to the plaintiff on May 9, 1994 and the costs and fees expended would revert to the United States, but that any appreciation of the stock beyond $5,891,-352.00 would belong to the plaintiff.

The defendant acknowledges that the government assisted in the transfer of the Biochem Pharma stock from Mr. Duboc to Mr. Bailey's account in Geneva, Switzerland. However, the defendant states that the stock was transferred to the plaintiff so that the plaintiff could "use proceeds in the account for the reasonable upkeep of the property in France until the Government found a buyer, and then, through forfeiture proceedings, transferred title to the United States." The defendant alleges that the plaintiff's role was "to serve as trustee of the fund, on behalf of the United States."

The alleged agreement at issue between the plaintiff and the defendant is based upon the conversations that the plaintiff claims were held between the plaintiff and the government agents who were acting on behalf of the United States; the agreement was never put into writing. In his complaint, the plaintiff alleges that the actions were taken:

with the approval of individuals who had actual authority to contract and bind the United States. These individuals included, but are not limited to, A.U.S.A. Gregory Miller; his superiors, including but not limited to U.S. Attorney Michael Patterson; and the appropriate representatives of the United States Department of Justice located in Washington, D.C., including but not limited to representatives of the Asset Forfeiture Division of the Department of Justice. These individuals had full authority to approve the agreement with Bailey and exercised that authority properly. The agreement with Bailey was in conformance with applicable Department of Justice regulations and guidelines relating to transfers to counsel in cases involving asset forfeitures and was in accord with all other Department of Justice and United States regulations, guidelines and procedures.

The plaintiff claims that, pursuant to the agreement between the parties and with knowledge of the defendant, he developed and implemented strategies to recover Mr. Duboc's property for the United States and, among other expenses, incurred the cost of retaining legal counsel in France to assist in the repatriation of the property.

On or about January 22, 1996, the defendant sought forfeiture of the 602,000 shares of Biochem Pharma stock that were in the plaintiff's possession by filing a motion with United States District Court Chief Judge Maurice M. Paul, who had presided over the *Duboc* criminal proceedings. The plaintiff alleges that this action took place after the government learned about the significant increase in the price of the Biochem Pharma stock. According to the complaint filed in this court, although the government had previously sought forfeiture of Mr. Duboc's other assets during 1994 and 1995, no forfeiture action had been initiated by the government for the Biochem Pharma stock that had been previously transferred to the plaintiff. Judge Paul ordered the plaintiff to return the Biochem Pharma stock to the registry of the District Court. Mr. Bailey was incarcerated on February 29, 1996 for civil contempt after failing to complete a return of the shares of the stock to the court. On March 22, 1996, a forfeiture order for the 602,000

shares of Biochem Pharma stock was stipulated to by the government and Mr. Duboc, but not by Mr. Bailey and was entered by Judge Paul. The plaintiff claims that the Biochem Pharma stock was worth in excess of $16 million at the time of the forfeiture order.

The plaintiff states that on April 24, 1996 he filed a petition in the District Court in response to the order of forfeiture requesting that the court issue an amended forfeiture order and declare that the 602,000 shares of Biochem Pharma stock and the proceeds therefrom were vested in the plaintiff. The plaintiff alternatively stated that the dispute involved a breach of contract and invoked jurisdiction under 28 U.S.C. § 1491. On May 16, 1996, the plaintiff filed a motion to transfer the case to the United States Court of Federal Claims. On May 17, 1996, the parties stipulated that the plaintiff's petition of April 24, 1996 would be dismissed with prejudice. The stipulation did not address Mr. Bailey's right to seek damages for breach of contract from the United States. The plaintiff alleges that to date he has received no compensation for his efforts in maintaining, liquidating, and repatriating Mr. Duboc's overseas assets, has received no compensation for the increased value of the Biochem Pharma stock, and has received no legal fees for his representation of Mr. Duboc.

The first count of the plaintiff's breach of contract action filed in this court states that the defendant breached an express contract with the plaintiff by taking action to deprive him of the 602,000 shares of Biochem Pharma stock, which allegedly were transferred to him in fee simple as consideration for his services to Mr. Duboc and to the United States. The second count of the complaint alleges breach of an implied-in-fact contract. The plaintiff claims that the government, through its agents, conducted itself in a manner that created an implied-in-fact contract between the parties. The plaintiff claims that the defendant breached this implied-in-fact contract by taking action to deprive the plaintiff of the 602,000 shares of Biochem Pharma stock and that this breach has severely damaged him financially.

The defendant argues that the Biochem Pharma stock had been obtained directly or indirectly through Mr. Duboc's drug trafficking activities and, therefore, was subject to forfeiture to the United States. The defendant states that the plaintiff knew that the stock was considered a forfeitable asset because Mr. Bailey had included it on a list of Mr. Duboc's assets which he had prepared and provided to the government while acting as counsel to Mr. Duboc. The defendant acknowledges that it assisted in the transfer of the stock to the plaintiff's personal account in Geneva, Switzerland, but states that its understanding of the oral agreement in question was that the plaintiff would use the stock or stock proceeds for the reasonable upkeep of Mr. Duboc's property in France until the property could be sold and the proceeds repatriated. The defendant estimates that the plaintiff sold 202,000 shares of the stock and, in return, received approximately $3 million. The defendant alleges that from this sale the plaintiff used approximately $100,000.00 for the upkeep of Mr. Duboc's properties in France. The defendant claims that the plaintiff moved substantial sums of money from his account in Switzerland that contained the stock to a personal account in Florida. The defendant further states that the plaintiff spent a large portion of this money on personal and business expenditures unrelated to the Duboc case.

The plaintiff does not seek a specific amount of damages, but instead, in both counts of the amended complaint, demands judgment against the defendant for: "1. an amount adequate to compensate him for his losses, together with interest and costs; and 2. any further relief the Court deems just and proper."

### DISCUSSION

When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), and/or a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch.* Serv., 846 F.2d at 746; *Alaska v. United States,* 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States,* 31 Fed. Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

█ In order for this court to have jurisdiction over plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491, requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351–52, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell*); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc*), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

█ Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. at 953. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 2967–68, 77 L.Ed.2d 580 (1983) (*Mitchell II*) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. at 954 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert.*

*denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

This court's predecessor, the United States Court of Claims, articulated the jurisdiction of this court, pursuant to 28 U.S.C. § 1491, in *Eastport Steamship Corp. v. United States,* as follows:

> Section 1491 of Title 28 of the United States Code allows the Court of Claims to entertain claims against the United States 'founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort'. But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money.

*Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 605, 372 F.2d 1002 (footnote omitted).

In the above-captioned case, the defendant has moved to dismiss the plaintiff's complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) or, in the alternative, for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(4). The plaintiff states that he has pleaded a contract action upon which relief can be granted by alleging the existence of each of the elements of a contract in his complaint. The plaintiff claims that an express contract existed between himself and the government or, in the alternative, that an implied-in-fact contract was created by the actions of the government officials who were acting on behalf of the United States.

█ The jurisdiction of the United States Court of Federal Claims, with respect to contracts, extends only to express or implied-in-fact contracts; it does not include claims based upon contracts implied-in-law. *Hercules Inc. v. United States,* 516 U.S. 417, 421–23, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996)(citing *Sutton v. United States,* 256 U.S. 575, 581, 41 S.Ct. 563, 565–66, 65 L.Ed. 1099 (1921); *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *United States v. Minnesota Mut. Inv. Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 502–03, 70 L.Ed. 911 (1926); *United States v. Mitchell,* 463 U.S. at 218, 103 S.Ct. at 2968–69); *Hatzlachh Supply Co. v. U.S.,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980) (citing *Alabama v. United States,* 282 U.S. 502, 507, 51 S.Ct. 225, 226–27, 75 L.Ed. 492 (1931); *Goodyear Tire & Rubber Co. v. United States,* 276 U.S. 287, 292–93, 48 S.Ct. 306, 306–07, 72 L.Ed. 575 (1928); *United States v. Minnesota Mut. Inv. Co.,* 271 U.S. at 217, 46 S.Ct. at 502–03; *Hill v. United States,* 149 U.S. 593, 598, 13 S.Ct. 1011, 1013, 37 L.Ed. 862 (1893)). In *Hercules Inc. v. United States,* the United States Supreme Court elaborated on the distinction between an implied-in-law contract and an implied-in-fact contract:

> The distinction between "implied in fact" and "implied in law," and the consequent limitation, is well established in our cases. An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426–427, 67 L.Ed. 816 (1923). *See also Russell v. United States,* 182 U.S. 516, 530, 21 S.Ct. 899, 904, 45 L.Ed. 1210 (1901) ("[T]o give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties–'a coming together of minds'"). By contrast, an agreement implied in law is a "fiction of law" where "a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." *Baltimore & Ohio R. Co., supra,* at 597, 43 S.Ct., at 426.

*Hercules Inc. v. United States,* 516 U.S. at 424, 116 S.Ct. at 986.

█ In a complaint, a well pleaded allegation of an underlying express, or implied-in-fact, contract "is sufficient to overcome challenges to jurisdiction" in the United States Court of Federal Claims. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997) (citing *Spruill v. Merit Sys. Protection Bd.,* 978 F.2d 679, 686 (Fed.Cir. 1992); *Gould, Inc. v. United States,* 67 F.3d

925, 929 (Fed.Cir.1995); *Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 639–40 (Fed.Cir.1989)). To establish a claim upon which relief can be granted, a plaintiff must allege the elements necessary to establish the existence of an express contract or an implied-in-fact contract. *Trauma Serv. Group v. United States,* 104 F.3d at 1325–27 (upholding dismissal for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), rather than for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1), when plaintiff's allegations were based upon claims of an express or implied-in-fact contract, but failed sufficiently to set forth the factual elements necessary to support either type of contract claim); *cf. Girling Health Sys., Inc. v. United States,* 949 F.2d 1145, 1146–47 (Fed.Cir.1991), *cert. denied,* 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 626 (1992) (dismissing case for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) when plaintiff had failed to establish the elements of a contract).

In *Gould, Inc. v. United States,* 67 F.3d 925 (Fed.Cir.1995), the United States Court of Appeals for the Federal Circuit discussed the distinction between a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4), and a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) in complaints alleging breach of contract:

> In *Spruill v. Merit Sys. Protection Bd.,* 978 F.2d 679 (Fed.Cir.1992), we discussed the differences between a dismissal for lack of jurisdiction and a dismissal for failure to state a claim upon which relief can be granted. Jurisdiction in this context refers to the power of a court to hear and decide a case—subject matter jurisdiction. *Id.* at 686. A dismissal for lack of jurisdiction means that the subject-matter of the dispute is one that the court is not empowered to hear and decide.
>
> A dismissal for failure to state a claim, however, is a decision on the merits which focuses on whether the complaint contains allegations, that, if proven, are sufficient to entitle a party to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99,

101–102, 2 L.Ed.2d 80 (1957) (A motion to dismiss for failure to state a claim should only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief."). In *Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637 (Fed.Cir.1989), we explained the differences between a dismissal for lack of jurisdiction and one for failure to state a claim upon which relief can be granted in the context of determining whether a time bar provision in a contract went to the jurisdiction of the forum or was a question of failure to state a claim for which relief could be granted. We said:

> The distinction between lack of jurisdiction and failure to state a claim upon which relief can be granted, is an important one: "[T]he court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy. Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover...."

*Id.* at 639–40 (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)).

*Gould, Inc. v. United States,* 67 F.3d at 929. Subsequently, *in Allen v. United States,* 100 F.3d 133 (Fed.Cir.1996), the court wrote that when a plaintiff "non-frivolously alleged a contract with the Government, and the Court of Federal Claims has jurisdiction over contract claims, there was no absence of subject matter jurisdiction" in the United States Court of Federal Claims due to its jurisdiction over contract claims. *Id.* at 135 (citing *Spruill v. Merit Sys. Protection Board,* 978 F.2d at 687–88).

■ A valid express contract requires that the following criteria have been met: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Management, Inc. v. United States,*

104 F.3d 1314, 1319 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997) (citing *Thermalon Indus., Ltd. v. United States,* 34 Fed.Cl. 411, 414 (1995) (citing *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *Fincke v. United States,* 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982))).

■ An implied-in-fact contract can only exist in the absence of an express contract. *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (1970), *supplemented by Algonac Mfg. Co. v. United States,* 198 Ct.Cl. 258, 458 F.2d 1373 (1972). In order to establish jurisdiction based on an implied-in-fact contract, the plaintiff must establish the elements of a contract, including offer, acceptance, consideration, mutuality of intent, and definiteness of terms. *Girling Health Sys., Inc. v. United States,* 949 F.2d at 1146–47 (citing *Tree Farm Dev. Corp. v. United States,* 218 Ct.Cl. 308, 319, 585 F.2d 493, 500 (1978); *Somali Dev. Bank v. United States,* 205 Ct.Cl. 741, 750–51, 508 F.2d 817, 822 (1974)); *see also City of El Centro v. United States,* 922 F.2d at 820 (citing *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Fincke v. United States,* 230 Ct.Cl. at 244, 675 F.2d at 295); *Fincke v. United States,* 230 Ct.Cl. at 244, 675 F.2d at 295 (citing *Baltimore and Ohio R.R. Co. v. United States,* 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *Shearin v. United States,* 25 Cl.Ct. 294, 296 n. 5, *aff'd,* 983 F.2d 1085 (Fed.Cir.1992). The plaintiff also must establish that the government official who allegedly formed the contract had actual authority to bind the government. *City of El Centro v. United States,* 922 F.2d at 820 (citing *Juda v. United States,* 6 Cl.Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947))); *Shearin v. United States,* 25 Cl.Ct. at 297 (citing *Radioptics, Inc. v. United States,* 223 Ct.Cl. 594, 612, 621 F.2d 1113, 1123 (1980); *Housing Corp. of Am. v. United States,* 199 Ct.Cl. 705, 711, 468 F.2d 922, 925 (1972)).

■ In the above-captioned case, the plaintiff has alleged the existence of the requisite elements for either an express contract or, alternatively, for an implied-in-fact contract. When deciding a motion to dismiss based on a 12(b)(1) motion for lack of jurisdiction, the court's role is only to determine if the plaintiff has properly alleged a claim that is compensable in this forum. "[T]he law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven." *Total Medical Management v. United States,* 104 F.3d at 1319 (citing *Spruill v. Merit Sys. Protection Board,* 978 F.2d at 686, *Gould, Inc. v. United States,* 67 F.3d at 929); *see Trauma Serv. Group v. United States,* 104 F.3d at 1325.

To prevail over a 12(b)(4) motion for failure to state a claim upon which relief can be granted, the plaintiff need not prove his case, but rather must state facts that, if proven, would allow him to prevail. A claim should not be dismissed for failure to state a claim upon which relief can be granted unless it is beyond a doubt that a plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. at 101–02 (footnote omitted); *see Gould, Inc. v. United States,* 67 F.3d at 929. The court does not need to determine "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Kinne v. United States,* 21 Cl.Ct. 104, 107 (1990) (quoting *Scheuer v. Rhodes,* 416 U.S. at 236, 94 S.Ct. at 1686).

In the instant case, the defendant offers several theories for why it believes that no contract with the plaintiff came into existence, including the following:

> The plea agreement, negotiated by Mr. Bailey upon behalf of Mr. Duboc, expressly provided that Mr. Duboc would assist the United States in recovery and return of assets acquired through his unlawful activities. The explanation of what happened here is simple: Since Mr. Bailey was representing Mr. Duboc, it became Mr. Bailey's obligation to assist in the recovery and return of the assets. Thus, any contract that Mr. Bailey had was really with his client, Mr. Duboc. Indeed, to suggest

that he could actually have any enforceable contract such as the one alleged in his complaint here suggests a bizarre conflict of interest given that the very people with whom Mr. Bailey alleges he "contracted" were opposing him in the prosecution of his client.

Under the forfeiture statute, 21 U.S.C. § 853 (1994), the United States is vested with title to property that is subject to forfeiture upon commission of an act which gives rise to forfeiture under 21 U.S.C. § 853(c). In addition, the Attorney General may "take appropriate measures necessary to safeguard and maintain property ordered forfeited under this section pending its disposition." 21 U.S.C. § 853(i)(5). Therefore, it is possible that Mr. Bailey could have entered into a contractual arrangement with the United States to preserve forfeited assets which had been owned by Mr. Duboc without doing so as part of the plaintiff's fee arrangement to represent Mr. Duboc in the criminal case.[2]

At oral argument before this court, the plaintiff's counsel opened his remarks by characterizing the case brought by Mr. Bailey differently from the description that was offered by the government, as follows:

> This, Your Honor, is clearly just a breach of contract case. Defendant seeks to portray this case in other ways. I just heard this case portrayed as a plea agreement case or a forfeiture case or a claim for attorneys' fees or a trust case.

> It is just a plain breach of contract case, as the facts demonstrate. It was a commercial contract for services, between the United States and Francis Lee Bailey, entered into by the Government and its proprietary capacity. And evidenced by the normal give and take and negotiations, that are shown in our Complaint and in our affidavit, to include the mutual intent to contract, the offer, the acceptance, the consideration and the authority for the Government to contract.

> The contract in this case, Your Honor, was for Mr. Bailey's services, in connection with the liquidation and repatriation of foreign assets. In exchange for these services, Mr. Bailey was fairly promised by the Government, that he would be compensated.

> Let me go through, if I may, the significant benefits to the Government. The services have virtually nothing to do with the legal representation of Mr. Duboc. The services have all to do with Mr. Bailey's experience, his knowledge and his reputation internationally, that made him a perfect property liquidator for the Northern District of Florida. Mr. Bailey bore responsibility for managing, maintaining, marketing and monitoring multiple foreign assets, that could be in the neighborhood of $80 to $100 million. And it relieved the Government of a tremendous proprietary burden in that regard.

> Mr. Bailey was to be compensated, through the transfer of shares of stock in a small start-up company called BIOCHEM. His compensation, however, entailed substantial risk. If the stock went down in value, Mr. Bailey would have to absorb the cost in fees for these repatriation efforts. Therefore, in exchange for the risk and for his liquidation and repatriation efforts, Mr. Bailey would also enjoy the concomitant gain or appreciation in theses [sic] stocks.

* * *

> The second part of the deal, was the cost of repatriation and liquidation. And the third part of the deal was seize for liquidation and repatriation. The fourth Part of the deal up to $5.8 million, was reserved for the Government. Everything else went to the Government.

> Except the next part of the deal says that everything over $5.8 million, would go to Mr. Bailey, because the exchange for the risk for his liquidation and repatriation services if that stock went up, he would

---

**2.** This court will not engage in determining a proper fee for the plaintiff's representation of Mr. Duboc in the United States District Court, which must be determined by the Judge who presided over the criminal action against Mr. Duboc. In papers filed with this court, the defendant reports that the District Court Judge gave the plaintiff until June 17, 1996 to make a claim to the court for his attorney's fees and expenses, but that the plaintiff did not make a claim by that date.

enjoy the appreciation. And if it went down, everything would be wiped out, or could be wiped out. He would get no legal fees. No costs. No fees for repatriation, and what the Government was entitled to, up to $5.8 million would not be paid.

In this Court, Your Honor, we do not make a claim for the legal fees. We do not make a claim for the cost of repatriation.

\* \* \*

*What we make a claim for, is the fees for repatriation and the appreciated value.* Importantly, Mr. Duboc pled guilty on May 13, 1994, and he disclosed all of his assets to the Government. Importantly, many of these assets were foreign, real estate and boats. Properties with very poor liquidity, and had no fixed value.

(emphasis added).

The government relies on *United States v. Monsanto,* 491 U.S. 600, 606, 109 S.Ct. 2657, 2661–62, 105 L.Ed.2d 512 (1989), in which the Supreme Court determined that under the Comprehensive Forfeiture Act of 1984, 21 U.S.C. § 853, "all assets falling within its scope are to be forfeited upon conviction, with no exception existing for the assets used to pay attorney's fees—or anything else, for that matter." In *Monsanto,* the District Court had granted a restraining order which froze assets belonging to the defendant. *Id.* at 603–04, 109 S.Ct. at 2660–61. The defendant moved to vacate this order so that he could use the frozen assets to retain an attorney. *Id.* at 604, 109 S.Ct. at 2660–61. The Supreme Court held that, under 21 U.S.C. § 853, the frozen assets could not be used because " § 853 does not exempt assets to be used for attorney's fees from its forfeiture provisions." *Id.* at 611, 109 S.Ct. at 2664.

Although the plaintiff did not address the *Monsanto* case in his pleadings, at oral argument, in response to the court's inquiry, counsel for the plaintiff stated:

> because *Monsanto,* as I understand, you cannot give a forfeitable asset to an attorney for attorneys' fees, unless you file for clearance. These were not attorneys' fees, number one. Number two, there was a forbearance here. There was a forbear-

ance because the Government could not claim forfeiture on these.

In the instant case, the plaintiff alleges that the government transferred the 602,000 shares of Biochem Pharma stock to him in fee simple on May 9, 1994, prior to the entry of Mr. Duboc's plea of guilty and conviction on May 17, 1994, after which certain of Mr. Duboc's properties became subject to forfeiture. As the plaintiff states in his opposition to the defendant's motion to dismiss:

> At the time the contract was entered into in this case, the Government had determined it would not seek to forfeit the assets to be transferred to Bailey. The Government permitted the stock to be transferred to Bailey in fee simple by Mr. Duboc and, indeed, assisted in implementing its transfer from UBS Luxembourg to Bailey's account in Switzerland.

Although many factual questions remain regarding the exact nature of the discussions between the plaintiff and the government representatives which allegedly led to the contract at issue, this case is distinguishable from *Monsanto* because the court in that case addressed property that the government had identified as subject to forfeiture and the court already had issued a restraining order freezing the assets. Moreover, in *Monsanto,* the defendant sought to release the frozen assets so that he could use the assets to retain an attorney.

The defendant also urges repeatedly that the agents from the Department of Justice with whom Mr. Bailey claims he reached the alleged agreement lacked the requisite contracting authority to bind the United States. Although at oral argument and in the defendant's filings, the defendant vociferously asserts that none of the agents of the United States who were involved in this case had authority to bind the government to the contract alleged by the plaintiff, it has proffered little evidence to refute the repeated allegations in the plaintiff's complaint that a contract was formed between himself and government agents who had authority to bind the United States. The plaintiff maintains that, at this stage of the litigation, he does not need to make further allegations or offer further support, and that, for jurisdictional

purposes, the court should not look beyond the unrefuted allegations contained in the complaint. The plaintiff requests that the court allow him discovery on the issue of authority to contract.

It is also significant that the defendant has not argued that a contract to engage Mr. Bailey's services to assist in repatriation and preservation of forfeited assets could not have come into existence. In fact, the forfeiture statute specifically authorizes the Attorney General to "take appropriate measures necessary to safeguard and maintain property ordered forfeited...." 21 U.S.C. § 853(i)(5). Moreover, the defendant states in its reply brief that, "[t]here was simply no approval by the Criminal Division Assistant Attorney General, who would have possessed actual authority to reach an agreement regarding the payment of fees. Accordingly, there simply was no enforceable contract." The defendant's own statement suggests that, under the appropriate circumstances, a contract could have been formed.

In the filings, there is specific discussion of whether an AUSA, such as Gregory Miller, could have possessed the requisite authority to enter into the contract at issue with Mr. Bailey. The forfeiture statute, however, only addresses the authority of the Attorney General to take measures to safeguard and maintain property subject to forfeiture and does not discuss the delegability of such authority. 21 U.S.C. § 853(i). The defendant attached to its reply brief a chapter from the *United States Attorneys' Manual*, which states in relevant part that:

> No formal or informal, written or oral, agreements may be made to exempt an asset transferred to an attorney as fees for legal services from forfeiture under 18 U.S.C. § 1963 or 21 U.S.C. § 853 or any civil forfeiture statute without the prior approval of the Assistant Attorney General, Criminal Division.

Although the defendant admits that this manual serves only as guidance for Department of Justice attorneys and does not have the force and effect of law, the above-quoted passage likewise indicates that agreements are negotiated by the Department of Justice with attorneys to compensate them for per-forming the services described in 21 U.S.C. § 853. In the record currently before the court, there is insufficient evidence, however, to determine at what level the discussions between the plaintiff and the defendant, which resulted in the transfer of the Biochem Pharma stock to Mr. Bailey, occurred and whether someone with the requisite authority approved the arrangement that the plaintiff claims resulted in the alleged contract.

The government also argues that Mr. Bailey may not relitigate claims which he already had an opportunity to litigate and which were resolved in the United States District Court with jurisdiction over the *Duboc* criminal case, since it was Mr. Bailey who chose not to pursue a claim for attorneys fees in that court. According to the defendant, when the plaintiff failed to respond to Judge Paul's order giving him until June 17, 1996 to make a claim for attorney fees and expenses based on his representation in the *Duboc* case, he lost his opportunity to make a claim for those fees and expenses. The plaintiff, however, claims that in the instant case he is seeking a remedy under the Tucker Act that was not available to him in the District Court action.

The doctrines of *res judicata* and collateral estoppel were summarized by the United States Supreme Court as follows:

> A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and *res judicata*, is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies...." *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Under *res judicata*, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1877); *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 867–68, 99 L.Ed. 1122 (1955); 1B J. Moore, Federal Practice ¶ 0.405[1], pp. 621–624 (2d ed.1974)(hereinafter 1B Moore); Restatement (Second) of Judg-

ments § 47 (Tent. Draft No. 1, Mar. 28, 1973)(merger); *id.*, § 48(bar). Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); Scott, Collateral Estoppel by Judgment, 56 Harv. L.Rev. 1, 2–3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977)(issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra,* at 49, 18 S.Ct. at 27–28; *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299, 37 S.Ct. 506, 507–08, 61 L.Ed. 1148 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979) (footnote omitted).

The doctrines of *res judicata* and collateral estoppel operate to prevent the re-litigation of a claim that has already had its day in court. *Mark Smith Constr. Co. v. United States*, 15 Cl.Ct. 32, 35–36 (1988). By affording a claimant only one opportunity to obtain redress, the doctrines conserve judicial resources, foster reliance upon judicial decisions, and protect litigants from vexatious and needless litigation. *Id.* at 36; *Martin v. United States*, 30 Fed. Cl. 542, 546, *aff'd*, 41 F.3d 1519 (Fed.Cir.1994); *Lins v. United States*, 4 Cl.Ct. 772, 777, *aff'd*, 758 F.2d 666 (Fed.Cir.1984).

■ As noted earlier in this opinion, this court is not the proper forum in which to determine whether or in what amount Mr. Bailey is entitled to attorneys fees for his representation of Mr. Duboc in the criminal court action in the United States District Court. In the above-captioned case, Mr. Bailey, however, has constructed a claim, which at least in part, could not have been brought during Mr. Duboc's criminal proceeding. A contract claim against the United States which requests damages in an amount greater than $10,000.00 must be brought in the United States Court of Federal Claims and cannot be brought in the United States District Court. According to the statute, "[t]he district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of: ... (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount...." 28 U.S.C. § 1346 (1994); *see Hoopa Valley Tribe v. United States*, 219 Ct.Cl. 492, 496–97, 596 F.2d 435 (1979); *King v. United States*, 182 Ct.Cl. 631, 637 n. 8, 390 F.2d 894 (1968), *rev'd on other grounds*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *Ove Gustavsson Contracting Co. v. Floete*, 278 F.2d 912 (2nd Cir.), *cert. denied*, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960)). Neither *res judicata* nor collateral estoppel bars jurisdiction in a case if the claim brought in the second suit could not jurisdictionally have been brought in the first case. The above-captioned case for breach of contract against the United States is properly lodged in this court.

### CONCLUSION

After thoroughly reviewing the pleadings submitted by the parties, the court **DENIES** the defendant's motion to dismiss at this time. For the purposes of the motion to dismiss, based on the information that is currently before the court, and viewing the unrefuted allegations in the complaint in the light most favorable to the plaintiff, the court finds that the plaintiff's complaint alleges a breach of contract which is within this court's jurisdiction to review. The court stresses that this opinion is not a disposition on the merits of the plaintiff's allegations, which raise a number of difficult and sensitive issues for both parties requiring further exploration. Although the plaintiff's complaint survives the defendant's motion to dismiss, issues including the terms of the alleged contract and whether an authorized govern-

ment official entered into a contract with the plaintiff remain to be resolved.

**IT IS SO ORDERED.**